IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Kimberly Hopkins, on behalf of herself and all others similarly situated, ) ) ) Plaintiff, ) vs. ) ) Horizon Management Services, Inc., and ) Deutsche Bank National Trust Company, ) ) Defendants. ) | CA No. 7:06-2935-HMH **OPINION & ORDER** |

This matter is before the court on Kimberly Hopkins' ("Plaintiff") motion for class certification and the Defendants' motion for summary judgment. For the reasons set forth below, the court grants the Defendants' motion for summary judgment and finds the Plaintiff's motion for class certification moot.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

This is a putative class action lawsuit alleging that the Defendants violated Section 9 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2608, which provides that

> [n]o seller of property that will be purchased with the assistance of a federally related mortgage loan shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be purchased by the buyer from any particular title company.

1

### A.  Specific Allegations

On July 28, 2006, Plaintiff Kimberly Hopkins entered into a contract with Horizon Management Services ("Horizon") as agent for Deutsche Bank National Trust Company ("Deutsche Bank") (collectively "Defendants") to purchase a residence located at 105 Lander Drive in West Columbia, South Carolina ("property").  (Pl.'s Mem. Opp'n Summ. J. Ex. 2 (Sales Contract).)  Horizon had previously serviced a loan secured by a mortgage on the property for Deutsche Bank and foreclosed on the property for Deutsche Bank.  Foreclosed properties that have been acquired by a lender or mortgage servicing company are called Real Estate Owned ("REO") properties.  (Defs.' Mem. Supp. Summ. J. Ex. 16 (Deprez Dep. at 15).)  On July 7, 2006, Horizon listed this REO property for sale through a South Carolina real estate agent.  (Pl.'s Mem. Opp'n Summ. J. Ex. 3 (Listing Agreement).)  The real estate listing agreement required that the contract of sale include a standard contract addendum ("addendum").  (Id. Ex. 3 (Listing Agreement))

> The addendum provided in pertinent part as follows:
>
> 3. Title/Closing Agent.  Seller shall select the title and closing agent.  The Seller shall pay the title examination fee and the premium for the owner's title insurance policy.  Buyer shall pay their customary closing fee to the closing/title agent.  If Buyer obtains a mortgage loan in connection with this purchase, the Buyer will pay any premium of a mortgagee title policy.  The Buyer is entitled to legal representation at the closing and may elect to have such representation at the Buyer's expense.  All closing transactions will be held at the Title/Closing Agent selected by the Seller.  It is Sellers intent to deliver owner's title insurance policy in lieu of an abstract in the customary abstract states.  The Buyer hereby accepts title insurance in lieu of an abstract if applicable.  In the event there is a requirement for the abstract to be updated, the associated expense will be a Buyer expense on the HUD 1 Settlement Statement.

(Pl.'s Compl. ¶ 23.);(Pl.'s Mem. Opp'n Summ. J. Ex. 2 (Sales Contract).) The addendum allowed Horizon to select the title and closing agent. Further, the addendum states that the seller will purchase an owner's policy. An owner's title policy is purchased by Horizon irrespective of whether the Plaintiff requests one. (Pl.'s Mem. Opp'n Summ. J. Ex. 1 (J. Syzmendera Dep. at 26).)

Fidelity Residential Solutions ("FRS") processed the title and closing work for the sale of the property pursuant to a service agreement between Horizon and FRS ("FRS Service Agreement"). FRS performs title, escrow, and closing management services for REO properties acquired by Horizon in approximately 40 states, including South Carolina. (Pl.'s Mem. Supp. Class Certification Ex. 4 (FRS Service Agreement) & Ex. 9 (Susan Wright Dep. at 5).) FRS provides Horizon a computer software program to manage its REO properties. (Id. Ex. 1 (Szymendera Dep. at 40).) FRS is a wholly-owned subsidiary of Fidelity National Financial ("Fidelity"), which owns several title insurance companies including: Fidelity National Title Company of New York ("Fidelity Title"), Chicago Title, Alamo Title, Ticor Title, and Security Union. (Id. Ex. 1 (Francene Deprez Dep. at. 8, 11).) FRS charges Horizon a flat fee of $150 for its services. (Id. Ex. 1 (Deprez Dep. at 15).)

The FRS Service Agreement requires that Horizon use field agents that write title insurance for one of Fidelity's title companies. (Pl.'s Mem. Opp'n Summ. J. Ex. 7 (Service Agreement).); (Id. Ex. 1 (S. Wright Dep. at 10).) For the sale of this property, FRS selected the closing agent, the Law Offices of Robert L. Luce ("Luce"). (Id. Ex. 1 (S. Wright Dep. at 9).) On June 6, 2006, prior to listing the property for sale, FRS sent Luce title order instructions that "the title commitment and policy MUST be issued on Fidelity paper." (Id.

3

Ex. 8 (Title Order).) Further, the instructions state that Luce's expenses "must be collected at closing." (Id.) Luce is the sole shareholder of Jayhawk Title Agency, which is an authorized title insurance agent for Fidelity Title. (Pl.'s Mem. Opp'n Summ. J. Ex. 1 (Diane Scocos Dep. at 6).) On June 13, 2006, Luce, through Jayhawk Title, issued a title insurance commitment on Fidelity paper for an owner's policy and a lender's policy. (Id. Ex. 9 (6/13/06 Title Commitment).) Luce testified that "[a] commitment is a commitment by a title insurance company as to the fact it will issue a policy upon certain requirements happening." (Id. Ex. 1 (Luce Dep. at 39).)

Prior to making an offer to purchase the property, the Plaintiff contacted Chris Brown ("Brown"), a mortgage broker for First Choice Mortgage and, later, Heritage Lending in Columbia, South Carolina, to inquire about financing. (Defs.' Mem. Supp. Summ. J. Ex. 11 (Brown Dep. at 22).) After entering into the contract for sale, the Plaintiff contacted Brown, now at Heritage Lending, to obtain financing to purchase the property.

Ultimately, the Plaintiff secured financing from First Franklin Financial Corporation ("First Franklin"), which required the issuance of a lender's title policy. (Pl.'s Mem. Opp'n Summ. J. Ex. 1 (Luce Dep. at 36-37).) In addition, First Franklin required a closing protection letter, which insured the closing for loss due to fraud, dishonesty, or negligence of a settlement agent in handling First Franklin's funds or documents. (Id. Ex. 1 (Luce Dep. at 36-37) & Ex. 12 (Closing Protection Letter).) Luce testified that he could not remember a time where an unaffiliated title insurance company provided a lender's title policy and issued an insured closing protection letter for a closing agent or attorney who was not an authorized title agent for that carrier. (Id. Ex. 1 (Luce Dep. at 37-38).)

4

Brown advised the Plaintiff that she needed to select a lawyer for the closing. Brown provided the Plaintiff a list of lawyers suggested by Brown. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Hopkins Dep. at 45-46) & Ex. 11 (Brown Dep. at 53-54).) From the list, the Plaintiff chose the Player Law Firm ("Player Firm"). (Id. Ex. 11 (Brown Dep. at 52-54).) The Plaintiff did not know any of the law firms on the list provided by Brown. The Plaintiff selected the Player Firm because she "liked the name." (Id. Ex. 1 (Hopkins Dep. at 46).) The Plaintiff did not investigate any other law firms. (Id. Ex. 1 (Hopkins Dep. at 46-47).)

Brown sent the Player Firm a title order for the property, and the Player Firm began preparing the title work. (Pl.'s Mem. Opp'n Summ. J. Ex. 1 (Brown Dep. at 55-56).) The Player Firm performed a title examination and issued a lender's title insurance commitment. (Id. Ex. 5 (Player Law Firm Title Commitment).) Subsequently, Brown was informed by the Luce firm and the real estate agent that the Plaintiff was required to use a title and closing agent selected by Horizon pursuant to the addendum. (Id. Ex. 1 (Brown Dep. at 62).) Upon learning this, Brown informed the Plaintiff that he believed that the Defendants' selection of the closing agent was improper. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Hopkins Dep. at 49-50).) Brown asked Heather Rollins ("Rollins"), a paralegal at the Luce firm, if the firm would be willing to purchase the title work previously prepared by the Player Firm. (Pl.'s Mem. Opp'n Summ. J. Ex. 1 ( Brown Dep. 66, 81-82).) However, Brown testified that Rollins would not agree. (Id.) Brown testified that neither the Defendants nor Luce ever told him that the lender's title policy had to be purchased from the same title company or title agent as the seller had used for the owner's policy. (Defs.' Mem. Supp. Summ. J. Ex. 11

(Brown Dep. at 74-78, 96-97).)    The Plaintiff testified that Brown told her that she had to use Fidelity Title Company for the title work. (Id. Ex. 1 (Hopkins Dep. at 68-69).)

Rollins followed up with a letter to the Plaintiff's real estate agent stating, "[i]t is the Seller's position that the Buyer has agreed contractually to close with the Seller's selected closing agent, and has advised us that should the Buyer default and refuse to close with the Seller selected to close her, the Buyer will forfeit the earnest money to the Seller." (Id. Ex. 10 (Rollins Letter).) The Plaintiff and the Plaintiff's real estate agent deny that they ever saw or received this letter. (Id. Ex. 1 (Hopkins Dep. at 63-64) & Ex. 14 (Spigner Dep. at 16-17).) Further, email correspondence between Rollins and the Player Firm paralegal states: "the Buyer did sign addendum number 1 which states in Item 3 that the Seller will select the closing agent, etc. Please let me know what the Buyer decides to do." (Id. Ex. 11 (Email correspondence).) The Plaintiff never raised any concern regarding the Defendants' selection of the closing agent. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Hopkins Dep. at 50).) The Plaintiff testified that she did not request to have an attorney from the Player Firm represent her in the transaction and never informed anyone that she wanted to purchase the lender's title policy from the Player Firm or any other firm. (Id. Ex. 1 (Hopkins Dep. at 64-65).) The closing was held on August 31, 2006. (Id. Ex. 1 (Hopkins Dep. at 38-40, 76-80).)

An owner's title policy and lender's title policy were issued by Fidelity National. The signed HUD-1 settlement statement indicates that the owner's policy was purchased by Horizon for $270 and the lender's policy was purchased by the Plaintiff for $75. (Id. Ex. 3 (HUD-1 Settlement Statement).) Further, the Plaintiff paid a settlement fee of $300.

6

Also, the Plaintiff signed a South Carolina Insurance Department Financial Disclosure form which provides that "[n]otice is hereby given that you have the right to choose your title insurer." (Defs.' Mem. Supp. Summ. J. Ex. 8 (Financial Disclosure Form) & Ex. 1 (Hopkins Dep. at 67-68).) In addition, prior to closing, Brown had provided the Plaintiff with a HUD information booklet stating that

> [u]nder RESPA, the seller may not require you, as a condition of the sale, to purchase title insurance from any particular title company. Generally, your lender will require title insurance from a company that is acceptable to it. In most cases you can shop for and choose a company that meets the lender's standards.

(Id. Ex. 6 (HUD Booklet 4).)

After the closing, Brown contacted the Plaintiff and again stated that he believed the Defendants' selection of the closing agent was illegal. (Id. Ex. 1 (Hopkins Dep. at 88-89).) This lawsuit ensued. Following the filing of this lawsuit, FRS changed its policy, and now the seller pays for the owner's and the lender's title insurance policies. (Pl.'s Mem. Opp'n Summ. J. Ex. 1 (W. Franklin Dep. at 68).)

## II. DISCUSSION OF THE LAW

### A. Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). With respect to this burden, "it is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion." Malina v. Baltimore Gas & Elec. Co., 18 F. Supp. 2d 596, 604 (D. Md. 1998).

### B. Defendants' Motion for Summary Judgment

The Defendants argue that no genuine issue of material fact exists, and that the only conclusion the evidence supports is that the Defendants did not violate 12 U.S.C. § 2608. In order to establish a violation of the statute, the Plaintiff must prove that she was required directly or indirectly, as a condition to purchasing the property, to purchase title insurance covering the property from a particular title company. Specifically, the Defendants allege that (1) the contract terms do not violate § 2608, (2) the "Plaintiff admits that she was not required to purchase title insurance from any particular company," and (3) the Plaintiff "received and

signed disclosures advising her that she had the right to purchase title insurance from any title company of her choosing." (Defs.' Mem. Supp. Summ. J. 2.)

The Defendants argue that the contract contains no requirement that the Plaintiff purchase title insurance from any particular title company. (Id.) Further, the Defendants submit that the Plaintiff admitted that no one, neither the Defendants nor anyone else involved in this transaction, led her to believe that she had to purchase title insurance from a particular title company. (Id.)

### 1. Owner's policy

The addendum states that the Defendants will purchase the owner's title insurance policy and that "[t]he Seller shall pay the title examination fee and the premium for the owner's title insurance policy." (Pl.'s Mem. Opp'n Summ. J. Ex. 2 (Sales Contract 1).) Pursuant to the plain language of § 2608, the Plaintiff cannot be required to purchase title insurance from a particular title company. A review of the HUD-1 Settlement Statement reveals that Horizon paid for the owner's policy. (Defs.' Mem. Supp. Summ. J. Ex. 3 (HUD-1 Settlement Statement).) A December 6, 1977, HUD Opinion stated that "where the seller purchases and pays for the title insurance at no cost to the buyer, Section 9 should not

be a cause for concern." (Id. Ex. 26 (December 6, 1977, HUD Opinion).)[1] Therefore, the issue is whether the Plaintiff indirectly purchased the owner's policy.

### A. Closing Funds

The Plaintiff raises several arguments in support of her position. First, the Plaintiff argues that because she was the only person to bring funds to the closing, she purchased the owner's title policy. (Pl.'s Mem. Opp'n Summ. J. 16.) This argument is without merit. It is standard practice in the real estate business to deduct the seller's closing costs from the proceeds the seller would otherwise receive at closing. (Id. Ex. 10 (Franklin Dep. at 74-75).) The HUD-1 indicates that the owner's policy cost $270 and that the seller paid for the owner's policy.

### B. Purchase Price of Property

In addition, the Plaintiff argues that, in essence, she purchased the owner's policy because its cost was built into the purchase price of the property since Horizon required an owner's policy irrespective of whether the Plaintiff requested it. (Pl.'s Mem. Opp'n Summ. J. 19-21.) There is no evidence to support this argument. The only evidence is that, pursuant to the HUD-1 signed by the Plaintiff, the seller purchased the owner's title policy. Further,

---

[1]All HUD opinions that pre-date November 1992 were withdrawn by operation of amendments to Regulation X. However, the amendments to Regulation X did not prohibit a seller from paying for title insurance. Further, "[a]lthough the rulings have been withdrawn, HUD counsel and other attorneys who work with RESPA frequently refer to them for guidance." See James H. Pannabecker & David McF. Stemler, RESPA Manual: A Complete Guide to the Real Estate Settlement Procedures Act, Vol. II, A8-1 (2006); (Defs.' Mem. Supp. Summ. J. Ex. 38 (RESPA Manual 15-1).) Therefore, the court finds this opinion to be instructive.

the Plaintiff agreed in her deposition testimony that the seller purchased the owner's policy. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Hopkins Dep. at 67).)

C.  Settlement Fee

Finally, the Plaintiff argues that she purchased the owner's policy because she paid the settlement fee of $300.  (Pl.'s Mem. Opp'n Summ. J. 21-23.)  The Plaintiff submits that the addendum requires the buyer to pay the closing/title agent its customary closing fee and that, under RESPA, "title insurance company" is defined to include the authorized title agent. The Plaintiff argues that the settlement fee required her to use a particular title insurance company because, under RESPA, the term "settlement services" includes "any service provided in connection with a prospective or actual settlement, including but not limited to . . . title searches, title examinations, abstract preparation, insurability determinations, and the insurance of title commitments and title insurance policies."  (Id. 22-23); 24 C.F.R § 3500.2.  "Settlement services" also includes services rendered by an attorney, the preparation of documents, the "rendering of credit reports or appraisals," the "rendering of inspections," services rendered by a real estate agent or broker, the origination of a federally-related mortgage loan, and "conducting of settlement by a settlement agent."  Id. § 3500.2.  Luce was the closing attorney and title agent for this transaction.

This argument, while creative, does not alter the fact that the Plaintiff did not purchase the owner's title policy.  It is customary for the closing attorney to charge a settlement fee. The settlement or closing fee is a distinct charge from the charges for title insurance on the HUD-1.  (Defs.' Mem. Supp. Summ. J. Ex. 3 (HUD-1 Settlement Statement).)  The settlement fee was paid to the Luce firm, not Luce's title company, Jayhawk Title.  (Id.)

The Plaintiff argues that the settlement or closing fee is under the heading "title charges," and that Regulation X defines "title services" to include title searches, title examinations, abstract preparation, insurability determinations, and the issuance of title commitments and title insurance policies. (Pl.'s Mem. Opp'n Summ. J. 23.); § 3500.2. However, the HUD-1 lists charges for abstract or title search, title examination, title insurance binder, title insurance, and owner's coverage separately. (Defs.' Mem. Supp. Summ. J. Ex. 3 (HUD-1 Settlement Statement).)  Therefore, the closing fee does not include charges related to title insurance. No inference can be drawn from the fact that the Plaintiff paid a settlement fee of $300, as this fee is wholly unrelated to the selection of the title insurance company. Hence, the settlement fee in no way reflects that the Plaintiff was required, directly or indirectly, to use any particular title company. Based on the foregoing, no genuine issues of material fact exist, and the only reasonable inference that can be drawn is that Horizon purchased the owner's title policy.

### 2. Lender's policy

The Defendants argue that the Plaintiff was free to purchase the lender's title policy from any title company or agent of her choice. The contract addendum stated that "[i]f Buyer obtains a mortgage loan in connection with this purchase, the Buyer will pay any premium of a mortgagee title policy." (Pl.'s Mem. Opp'n Summ. J. Ex. 2 (Sales Contract 1).) While the addendum did not specifically advise the Plaintiff that she was free to use another title insurance company, the contract did not require the Plaintiff to use any particular title insurance company to purchase the lender's policy. Notably, the Plaintiff has not cited any legal precedent to support the argument that the Defendants were required to explicitly state in

the addendum that the Plaintiff was free to purchase the lender's title policy from any title insurance company. In addition, section 9 does not contain a notice requirement.

Further, the Plaintiff stated that the Defendants did not tell her that she was required to purchase title insurance from any particular insurance company. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Hopkins Dep. at 60).) Moreover, the Plaintiff admitted signing a South Carolina Insurance Department Financial Disclosure form, which provides that "[n]otice is hereby given that you have the right to choose your title insurer." (Defs.' Mem. Supp. Summ. J. Ex. 8 (Financial Disclosure Form) & Ex. 1 (Hopkins Dep. at 67-68).) In addition, prior to closing, Brown provided the Plaintiff with a HUD information booklet stating that

> [u]nder RESPA, the seller may not require you, as a condition of the sale, to purchase title insurance from any particular title company. Generally, your lender will require title insurance from a company that is acceptable to it. In most cases you can shop for and choose a company that meets the lender's standards.

(Id. Ex. 6 (HUD Booklet 4).)

### A.  Lender's Requirements

The Plaintiff argues that, as a result of the lender's requirements, the buyer is limited in his or her selection of title insurance companies to companies for which the selected closing agent is an authorized title agent. (Pl.'s Mem. Opp'n Summ J. 27.) First Franklin required a closing protection letter, which insured the closing for loss due to fraud, dishonesty, or negligence of a settlement agent in handling First Franklin's funds or documents. (Id. Ex. 1 (Luce Dep. at 36-37) & Ex. 12 (Closing Protection Letter).) Luce testified that he could not remember a closing where an unaffiliated title insurance company provided a lender's title policy and issued an insured closing protection letter for a closing agent or attorney who was

not an authorized title agent for that carrier. (Id. Ex. 1 (Luce Dep. at 37-38).) Thus, the Plaintiff argues that she was limited to title insurance companies for which Luce was an authorized agent. This argument fails. Section 2603 states that sellers cannot require a buyer to use a particular title insurance company. Therefore, the fact that a lender's requirements might limit the Plaintiff's choice of title insurance company is irrelevant to the question of whether the seller required the Plaintiff to use any particular title insurance company.

### B. FRS Title Instructions

Further, the Plaintiff argues that FRS required that the title insurance be issued on Fidelity paper. (Id. 25-27.) This argument also fails. Before the Plaintiff entered into a contract for sale on the property, FRS placed a title order for the property to determine if there were any issues that needed to be cleared before the property was marketed for sale. (Id. Ex. 1 (Scocos Dep. at 5).); (Defs.' Mem. Supp. Summ. J. Ex. 10 (Franklin Dep. at 19).) The title instructions stated, in pertinent part, that "the title commitment and policy MUST be issued on Fidelity paper." (Pl.'s Mem. Opp'n Summ. J. Ex. 8 (Title Order).) A title commitment was prepared for an owner's and lender's policy. (Id. Ex. 9 (6/9/06 Title Commitment).) However, the fact that the title work was ordered prior to marketing the property for sale did not require the ultimate buyer of the property to use Fidelity Title for the lender's policy.

The instructions reference a title commitment and policy in the singular, meaning one commitment and one policy. If the property had been sold for cash, a lender's policy would have been unnecessary, because no lender would have been financing the transaction. At the time that FRS placed the title order, FRS did not know whether the buyer would purchase the

property with cash or finance the purchase. Moreover, there is no evidence that Brown was ever told by the Defendants that the Plaintiff had to use any particular title company. (Defs.' Reply Supp. Summ. J. Ex. 1 (Brown Dep. at 96-97).) The Plaintiff testified that all of her dealings were with Brown. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Hopkins Dep. at 48, 56, 62).)

### C.  Economic Coercion

Further, the Plaintiff argues that the buyer has no economically viable alternative to the title company selected by the agents for Horizon and Deutsche Bank to issue the owner's policy. (Id. 27-28.) Because the Defendants paid for the owner's title policy, obtaining a lender's policy from the same title insurance company was only $75. However, if the Plaintiff had obtained a lender's title insurance policy from another title insurance company, it would have cost her several hundred dollars. (Id. 28.)

> Regulation X of RESPA defines "required use" as
>
> a situation in which a person must use a particular provider of a settlement service in order to have access to some distinct service or property, and the person will pay for the settlement service of the particular provider or will pay a charge attributable, in whole or in part, to the settlement service. However, the offering of a package (or combination of settlement services) or the offering of discounts or rebates to consumers for the purchase of multiple settlement services does not constitute a required use. Any package or discount must be optional to the purchaser. The discount must be a true discount below the prices that are otherwise generally available, and must not be made up by higher costs elsewhere in the settlement process.

24 C.F.R § 3500.2. An economic incentive to purchase title insurance from Fidelity Title is not the same thing as a direct or indirect requirement to purchase title insurance from Fidelity Title. Further, the definition of "required use" in Regulation X supports the conclusion that

15

offering an optional service at a discount is not a required use. Based on the foregoing, this argument fails.

### D.  The Instant Transaction

The Plaintiff alleges that she was explicitly denied her right to select a title insurance agent and company for the issuance of the lender's title insurance commitment and policy by Horizon's agents. (Pl.'s Mem. Opp'n Summ. J. 28-30.) An Informal HUD Opinion dated July 18, 1989, states that

> the attorney chosen for the seller must give the borrower free choice as to which title insurance company is chosen. Even if the attorney may only represent a small number of title insurance companies, the borrower must have total freedom to choose one of these title companies or to choose a title insurance company not represented by the attorney.

(Id. Ex. 30 (July 18, 1989 HUD Opinion).)

There is no evidence that the Defendants or the Defendants' agents ever informed the Plaintiff that she had to use any particular title insurance company. (Id. Ex. 1 (Hopkins Dep. at 60).) Hopkins testified that Brown told her that she had to use Fidelity Title. (Id. Ex. 1 (Hopkins Dep. at 68-69).) However, Brown is not an agent of the Defendants. Moreover, Brown testified that no one ever told him that the Plaintiff had to use any particular title company. (Defs.' Reply Supp. Summ. J. Ex. 1 (Brown Dep. at 96-97).) Further, Brown testified that after he learned that, pursuant to the addendum, the seller had selected Luce as the closing agent, he asked Rollins, Luce's paralegal, if the Luce law firm would purchase the title work prepared by the Player Firm. (Id. Ex. 1 ( Brown Dep. 66, 81-82).) Rollins' refusal to purchase the Player Firm's title work in no way prevented the Plaintiff from purchasing the title work herself from the Player Firm if she so desired. The Plaintiff never

indicated that she wanted to purchase the lender's policy from the Player Firm. (Id. Ex. 1 (Hopkins Dep. at 64-65).)

When the Plaintiff selected the Player Firm for the closing, she did not realize that the addendum required her to use the closing agent selected by the seller. Upon learning that the seller had selected Luce as the closing agent, the Plaintiff did not object to using the Luce firm. (Defs.' Mem. Supp. Summ. J. Ex. 1 (Hopkins Dep. at 50).) Further, the Plaintiff never raised any issue regarding the lender's title insurance to the Defendants. In addition, the addendum specifically informed the Plaintiff that she had the right to legal representation at her own expense. (Pl.'s Mem. Opp'n Summ. J. Ex. 2 (Sales Contract).) The Plaintiff was free to hire the Player Firm to represent her at closing and to use the Player Firm's title agent to issue a lender's title policy.

### E.  FRS's Policy Change

Finally, the Plaintiff alleges that the fact that FRS changed its policy following the filing of this lawsuit to require that the seller pay for the lender title insurance policy is a concession that the Defendants' practices violated section 9. The Plaintiff argues that this is relevant impeachment evidence. However, subsequent remedial measures are inadmissible. Fed. R. Evid. 407 ("When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction."). In addition, this evidence cannot create a genuine issue of material fact. Wehling v. Sandoz Pharm. Corp., No. 97-2212 1998 WL 546097, at *6 (4th Cir. Aug. 20, 1998) (unpublished);

Macuba v. Deboer, 193 F.3d 1316, 1324 n.17 (11th Cir. 1999) ("[P]otential impeachment evidence . . . may not be used to create a genuine issue of material fact for trial.  Because [the] statements will be admissible at trial only as impeachment evidence, the statements do not create a genuine issue of fact for trial.").  Hence, this argument is without merit.

Therefore, it is

**ORDERED** that the Defendants' motion for summary judgment, docket number 20, is granted.  It is further

**ORDERED** that the Plaintiff's motion for class certification, docket number 13, is denied as moot.  It is further

**ORDERED** that the Defendants' motion for leave to file supplemental opposition to Plaintiff's motion for class certification, docket number 44, is denied as moot.

**IT IS SO ORDERED.**

                                              s/Henry M. Herlong, Jr.
                                              United States District Judge

Greenville, South Carolina
September 20, 2007